# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 12 |
| CROOKED CREEK CORP., ) | |
| ) | Bankruptcy No. 09-02352 |
| Debtor. ) | |

## RULING ON OYENS FEED & SUPPLY, INC.'S OBJECTION TO PRIMEBANK'S THIRD AMENDED PROOF OF CLAIM

This matter came before the Court for telephonic hearing. Joel Vos appeared for Oyens Feed & Supply Inc. ("Oyens"). John O'Brien and Nicole Hughes appeared for Primebank. Carol Dunbar appeared for herself as Chapter 12 Trustee. The Court took the matter under advisement. The parties filed post-hearing briefs. This is a core proceeding under 11 U.S.C. § 157(b)(2)(A).

## STATEMENT OF THE CASE

Oyens objects to the amount of Primebank's claim. Oyens argues that the Court already decided the amount of Primebank's claim when it ruled on Oyens' and Primebank's lien-priority dispute. Oyens argues that res judicata precludes Primebank from arguing that it is owed more than this Court already determined. Primebank argues that res judicata does not apply because lien priority, not the amount of its unsecured claim, was the issue before the Court in the adversary. The Court sustains Oyens' objection.

## BACKGROUND

Crooked Creek Corp. ("Crooked Creek") ran a farrow-to-finish hog feeding operation. Crooked Creek owed Primebank and Oyens money. Both Primebank and Oyens had liens on Crooked Creek's hogs. Crooked Creek filed bankruptcy. This Court approved the sale of the hogs and the sale proceeds were escrowed in a cash collateral account. The creditors' liens attached to the proceeds in the same nature and priority as their liens attached to the hogs. The $358,841.10 in sale proceeds were insufficient to satisfy both parties' liens.

Crooked Creek filed adversary case 09-09093 to determine lien priority in the hog proceeds between Oyens and Primebank. Oyens and Primebank disputed the amount and priority of their respective liens. Oyens claimed a perfected superpriority agricultural supplier's lien under Iowa Code § 570A.5(3) in the proceeds for its full claim. Primebank disputed whether and to what extent Oyens had a superpriority agricultural supply dealer's lien. Oyen's disputed the amount of Primebank's claim.

The present issue is whether the Court decided the amount of Primebank's claim in that adversary. Oyens argues that the amount of Primebank's claim was raised and decided in the trial on the adversary. Primebank disagrees. Primebank argues that the adversary was about the relative priority of liens, not about how much it is owed.

To provide a complete background for this dispute, the Court will review three rulings in that adversary—all of which relate to guarantor payments that Primebank received on its claim against Crooked Creek and the effect of these payments on the amount of Primebank's claim.

The first ruling is on a motion to compel. As part of the adversary, Oyens submitted interrogatories and requests for production to Primebank. In particular, Oyens wanted information about whether Primebank received payments from guarantors on its claim against Crooked Creek, and if so, how much. Primebank did not respond to these interrogatories or produce documents related to its dealings with guarantors and how much it was owed. Oyens filed a motion to compel Primebank to answer and to produce the requested documents. Primebank filled a cross-motion for a protective order.

The Court issued a written ruling on this discovery dispute. Crooked Creek Corp. v. Primebank (In re Crooked Creek Corp.), Bankr. No. 09-02352, Adv. No. 09-9093S, 2013 WL 1332245, at *2 (Bankr. N.D. Iowa Mar. 28, 2013). As a part of that ruling, the Court granted Oyen's motion to compel with respect to information on Primebank's dealings with guarantors and how much Primebank was owed. Id. at *2–3. The Court noted that Primebank was not entitled to more than it was owed, and that, as a result, information about guarantor payments and

how much Primebank may have already been paid was properly discoverable in the adversary. Id. at *3.

The second ruling is on a motion for sanctions. In response to the Court's order to produce information on Primebank's dealing with the guarantors, Primebank stated that it had no such documents in its possession. This turned out to be false. Primebank did in fact have documents about receiving guarantor payments. As a result, Oyens filed a motion for sanctions. The Court, in another written ruling, granted Oyens' motion for sanctions against Primebank for falsely responding to the Court's order compelling Primebank to produce documents about the guarantor payments it received. Crooked Creek Corp. v. Primebank (In re Crooked Creek Corp.), 533 B.R. 274, 281 (Bankr. N.D. Iowa 2015).

The last and most important ruling in resolving this dispute is the Court's ruling on the trial. In that written ruling, the Court concluded as follows:

> For the reasons stated above, the Court concludes that Oyens has a superpriority claim for $156,367.43 and an unsecured claim for $186,004.35. Debtor's unpaid yardage and vet fees of $16,570.00 are in addition to Oyens' unsecured claim for feed supplied, bringing the total unsecured claim to $202,574.35. Primebank's secured claim is limited to $315,270.19.

Oyens Feed & Supply, Inc. v. Primebank (In re Crooked Creek), Bankr. No. 09-02352, Adv. No. 09-9093, at 12 (Bankr. N.D. Iowa October 21, 2014). The Court ruled that "Oyens will receive $156,367.43 of the escrowed funds, and Primebank will receive the remainder." Id.

4

Oyens appealed this ruling to the United States District Court for the Northern District of Iowa. Primebank crossappealed. The District Court certified two questions of statutory interpretation to the Iowa Supreme Court about how to properly apply Iowa's agricultural suppliers lien under Iowa Code § 570A.5. Oyens Feed & Supply, Inc. v. Primebank, No. C14-4114-DEO, 2015 WL 2082963, at *4 (N.D. Iowa May 5, 2015), report and recommendation adopted, No. 14-CV-4114-DEO, 2015 WL 2130850 (N.D. Iowa May 7, 2015). The Iowa Supreme Court answered the certified questions. Oyens Feed & Supply, Inc. v. Primebank, 879 N.W.2d 853, 860 (Iowa 2016). The parties agreed that the Iowa Supreme Court's answers resolved all pending issues on appeal. Oyens Feed & Supply, Inc. v. Primebank, No. C14-4114-LTS, at 4 n.1 (N.D. Iowa July 7, 2016) (copy available at Adv. No. 09-9093, Doc. 198). Based on the Iowa Supreme Court's answers to the certified questions, the District Court affirmed this Court's decision and denied both appeals. Id. at 4.

Immediately following the District Court's affirmation, Primebank filed a Third Amended Proof of Claim for $741,865.50. Oyens objected to the Third Amended Proof of Claim. Oyens argued that, based on this Court's ruling, less subsequent payments, Primebank's claim is now only $62,796.52. Primebank responded that the amount in its Third Amended Proof of Claim is correct and that the Court did not "adjudicate" the amount of its unsecured claim in the adversary.

5

# DISCUSSION

The parties dispute whether the Court has already decided the amount of Primebank's claim. Oyens argues that the amount of Primebank's claim was at issue in the adversary and that the Court determined the amount of the claim in its ruling. Oyens concludes that res judicata precludes Primebank from relitigating the amount of its claim. Primebank argues that the amount of its claim was not at issue in the adversary. Primebank argues that the only issue was about lien priority—in particular, whether and to what extent Oyens had an agricultural supplier's lien under Iowa Code § 570A.5. Primebank concludes that, because the amount of its claim was not at issue, the Court did not conclusively decide the claim amount and res judicata does not apply. Primebank also argues that Oyens' improperly takes write-offs, guarantor payments, and other actions into account in characterizing the amount of Primebank's claim that remains.

The primary issue here is the application of res judicata. Res judicata "bars a party from litigating claims that either were or could have been raised in an earlier proceeding." In re Legassick, 534 B.R. 362, 366 (Bankr. N.D. Iowa 2015) (citing Brown v. Felsen, 442 U.S. 127, 131 (1979)).

> [Res judicata] is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. . . . To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves

6

> judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2331 (2016) (Alito, J., dissenting) (quoting Montana v. United States, 440 U.S. 147, 153–54 (1979)) (internal quotation marks omitted). "Res judicata incorporates the related concepts of issue preclusion and claim preclusion." Magee v. Hamline Univ., 775 F.3d 1057, 1059 (8th Cir. 2015); see also A.H. ex rel. Hubbard v. Midwest Bus Sales, Inc., 823 F.3d 448, 450 n.2 (8th Cir. 2016) ("Res judicata … refer[s] both to claim preclusion and collateral estoppel (issue preclusion)."); Jaakola v. U.S. Bank Nat. Trust Ass'n, 609 F. App'x 877, 879 (8th Cir. 2015) (same); Sandy Lake Band of Miss. Chippewa v. United States, 714 F.3d 1098, 1102 (8th Cir. 2013) (same).

"Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." Sandy Lake, 714 F.3d at 1102 (quoting Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n. 1 (1984)) (internal quotation marks omitted). "The underlying goal of issue preclusion . . . is to promote judicial economy and finality in litigation." Liberty Mut. Ins. Co. v. FAG Bearings Corp., 335 F.3d 752, 758 (8th Cir. 2003). The party invoking res judicata has the burden to show that it applies. Legassick, 534 B.R. at 366.

To show that issue preclusion bars a claim in the Eighth Circuit, a party must show the following five elements:

7

    (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit;

    (2) the issue sought to be precluded must be the same as the issue involved in the prior action;

    (3) the issue sought to be precluded must have been actually litigated in the prior action;

    (4) the issue sought to be precluded must have been determined by a valid and final judgment; and

    (5) the determination in the prior action must have been essential to the prior judgment.

Estrada–Rodriguez v. Lynch, 825 F.3d 397, 402 (8th Cir. 2016) (quoting Anderson v. Genuine Parts Co., 128 F.3d 1267, 1273 (8th Cir. 1997)) (internal quotation marks omitted).

Oyens argues that this Court's ruling in Oyens Feed & Supply, Inc. v. Primebank (In re Crooked Creek), Bankr. No. 09-02352S, Adv. No. 09-9093 (Bankr. N.D. Iowa October 21, 2014) meets the elements of issue preclusion with respect to the amount of Primebank's claim. Primebank argues that the amount of its claim was not involved in the adversary, which it argues only involved lien priority. Primebank argues that the Court's determination about the amount of its claim was not essential to the judgment. The Court will address these elements.

    **I.    Identity of Issues**

Oyens argues that the amount of Primebank's claim was at issue—and was decided—in the adversary. Primebank argues that the adversary was a lien priority

determination and that the only issue with respect to its claim was "whether an obligation of not less than $358,841.10 existed to support a security interest in disputed cash collateral totaling $358,841.10." Primebank's brief, Doc. 133 at 3. Primebank concludes that the amount of its unsecured claim was not before the Court in the adversary. The rulings on the motion to compel and the motion for sanctions, the trial transcript, the briefs, and the language and logic of the Court's ruling, however, show that Oyens in fact made the amount of Primebank's claim an issue and it was fully and finally adjudicated in the adversary.

In its ruling on Oyens' Motion to Compel, the Court concluded that Primebank had to provide information about its dealings with guarantors:

> As Primebank is not entitled to more than its claimed amount, any payment by guarantors would reduce the allowed amount Primebank may recover from the estate, and perhaps even satisfy the lien. Because Primebank would be the recipient of such payments, it should have no trouble in providing this relevant information. Oyens' Motion to Compel answers on Interrogatories 7 and 8 is granted due to the relevance of the requested information on Oyens' and Primebank's competing liens and their relative priority.

Crooked Creek v. Primebank (In re Crooked Creek Corp.), Bankr. No. 09-02352S, Adv. No. 09-9093S, 2013 WL 1332245, at *2–3 (Bankr. N.D. Iowa Mar. 28, 2013). Thus, the Court found that information about Primebank's payments from guarantors was relevant—because such payments affected its claim amount—early on in the litigation. Primebank, however, did not provide that information even after the Court order it to do so, which led to the ruling on sanctions:

9

> The Court granted Oyens' Motion to Compel in relevant part on March 28, 2013. In granting the motion, the Court ordered Primebank to produce information on its dealings with the Guarantors. Primebank responded to Oyens by stating Primebank had no such documents in its possession. This response turned out to be untrue and has led directly to the issue pending before this Court.

Crooked Creek v. Primebank (In re Crooked Creek Corp.), 533 B.R. 274, 277 (Bankr. N.D. Iowa 2015). Oyens got the documents only after learning about their existence while preparing for trial:

> Oyens did not learn that Primebank's statements were untrue until October 2013, after speaking with the Guarantors about testifying at trial. Oyens learned that Primebank entered into multiple transactions with the Guarantors on December 29, 2009. The Guarantors received three loans from Primebank, in the amounts of $2,200,000.00, $565,818.00, and $358,841.00. These amounts were believed to be the total amount owed to Primebank by the Guarantors as individuals and in their capacity as Debtor's Guarantors. Primebank admitted that the purpose of these loans was to satisfy both the Guarantors' personal debt and their guarantor liabilities.
>
> After learning of the December 2009 transactions, Oyens subpoenaed the Guarantors' documents. Primebank finally produced them on October 15, 2013.

Id. Thus, even before trial, the guarantor transactions had been the subject of litigation and protracted discovery—because "any payment by guarantors would reduce the allowed amount Primebank may recover from the estate, and perhaps even satisfy the lien." Crooked Creek, 2013 WL 1332245, at *2–3. These disputes and rulings show that the amount of Primebank's claim was at issue, especially with respect to the guarantor transactions, even before trial.

10

The fact that the amount of Primebank's claim and the related guarantor transactions were at issue becomes even clearer when reviewing the transcript of the trial on the amount of Primebank's secured claim and related filings. During opening arguments at trial, the Court asked the parties how much they thought Primebank was owed. Mr. Vos, counsel for Oyens, initially stated:

> [W]e think that there is a real issue as to how much they're—Primebank is owed. When you look at Primebank's evidence, the exhibit—the only exhibit that I think shows—that shows a current balance, what the current balance is that's owed to Primebank, is Exhibit 43. And that shows about $515,000 being owed, but that doesn't apply all of the settlement proceeds that were received from the settlement that Primebank made with the Langels.

Adv. 09-9093, Doc. 186 at 9 (transcript of hearing held April 22, 2014). The Court then asked Mr. Vos, "So how much do you think Primebank's owed?" Id. at 10. Mr. Vos responded: "I think it's around $115,000." Id. The Court later asked Mr. Sandburg, counsel for Primebank, the same question.

> THE COURT: Okay. How much do you think you're owed?
> MR. SANDBERG: The entire amount of the escrow funds, Your Honor, $358,000 and change.
> THE COURT: And remind me what your argument was about the payments you received from the guarantors.
> MR. SANDBERG: That some of those payments were applied, pursuant to agreements, some, you know, mostly informal agreements between the guarantors and Primebank. Some of those were applied to the Crooked Creek debt, and to the guarantee obligations, that the guarantors, completely separate and apart from guarantee obligations, owed Primebank over $2 million, personally, well in excess of the amounts we're talking about in this case, and that everyone sat down and arrived at the best arrangements they could, not knowing what was

11

> going to happen in this case, arrived at the best arrangements they could to satisfy those obligations, collectively.
>
> There were some notes. There was come collateral sold and there were some payments. And there were some payments applied to the guaranteed debt that, for the debtor here, and then there was a lot more applied to the personal obligations of the debtor—of the debtor's principals, of the Langels. And that once those payments from the guarantors had been applied, there is a principal amount, under any measure, that far exceeds the amount of the escrowed funds in this case.

Id. at 15–16. Mr. Sandberg did not argue that the amount of Primebank's claim was not at issue. He did not argue that it was irrelevant to the trial or resolution of the adversary. In answer to the Court's question he stated that he thought Primebank was owed "[t]he entire amount of the escrow funds . . . $358,000 and change." Thus, at the beginning of trial, Primebank and Oyens disagreed about how much Primebank was owed.

During closing arguments, the parties revisited the issue of Primebank's claim amount and what the evidence showed. The Court noted that there was evidence about the guarantor payments and asked how that played into the amount of Primebank's claim. Mr. Vos explained Oyen's position about Primebank's claim amount and the Court concluded that the issue needed to be addressed.

> THE COURT: . . . I'm not sure what all the—what I do with all the discussion with the first witness from the bank about paying the guarantors and how that all washes out. And I guess I did the calculation like this last night. There's—somebody threw out the numbers, 300 and some thousand in proceeds that are sitting there. Is that correct?
> MR. SANDBERG: Correct.
> THE COURT: All right. And the question is who's entitled to those proceeds, right?

12

MR. VOS: That's correct.

THE COURT: And we have what I view to be competing claims to those proceeds. But if I played both of your arguments out, there would be proceeds left over, right? You would have only, you know, fifty some thousand and you'd have whatever reduced down a hundred and some that you said is available after all that. You'd—I guess all that being how the interface is with the guarantors. And I think I asked you in—excuse me, in opening, and you said that you thought they were owed somewhere in the hundreds of—a hundred thousand and some dollars, right?

MR. VOS: That's correct.

THE COURT: Okay.

MR. VOS: And the way that I get there, Your Honor, is that you have that Exhibit that shows 515,000 being owed. And then you've got—the question really is how were loans two and loans—and loan three applied or not applied to that. And I think the testimony is that only 215,000 was ever applied to that. And we would take the position that all of loan two, all that 565,818 should have been applied to reduce that, that the forgiveness of 200,000 was intended to be a forgiveness of Crooked Creek debt, and that 365,000 was received rather than 215,000 so there's another hundred and fifty that needs to come off of that.

THE COURT: So what's your number? Do you think the bank is still owed anything?

MR. VOS: I think the bank is still owed about 115,000.

THE COURT: Okay.

MR. VOS: And the last piece of how I get there—because that gets you down to about one sixty-five. The last fifty is the 50,000 that they collected on loan number three that's sitting there.

THE COURT: All right. Well, you just think about how much time you want me to spend with that and map that all the way through. I don't want to get tied up in an issue that I don't need to spend an inordinate amount of time with, but let me tell you why I'm reflecting on that, because theoretically, if you're saying the bank's only owed a hundred and—what was it again, hundred and fifteen?

MR. VOS: One-fifteen.

THE COURT: Then we'd have a—you know, a situation where you're perfected over the bank in some amount of money that I've limited by some ruling and then—but you still have a lien that's not perfected in the remainder. So you're saying you would get the one-fifty plus whatever the lien amount—

13

> MR. VOS: That's correct.
> THE COURT:—sits out there. Okay. So I do probably have to address that issue at some point in time.

Adv. 09-9093, Doc. 187 at 89–91 (Transcript of hearing held April 23, 2014). The Court reiterated this point later on in its remarks to Oyens' counsel.

> I do think I need to decide this issue about what—how the payment of the guarantors interfaces with all this. And I'll just say, Mr. Vos, I think you've got a little bit of an uphill battle on that one. I do think the bank documents give the bank a fair amount of discretion on how it wants to treat guarantees and guarantors. And I will say the testimony was less than clear how that all went down, and I don't know exactly what to make of that. I know they wanted to do something that freed up the Langels, and that's something that a bank might be entitled to do, and it seems like they have a right to do some of that. I do think there are a lot of questions of how these things are applied, but you're going to have to show me some firm law that directs that in this situation, when you off a personal debt and guarantors, if you're paying off the guarantors, you're functionally—or not you're functionally, you are paying off the bank. Excuse me, you're paying off the debt of the company. So I would need something beyond just what you think happened, or what you think should have happened, or what was really intended, or what it looks like. I need something that says that's what happens in that situation because I do think the bank has built into its own documents some discretion. And there were some highlighted portions of the documents that I find to be consistent with my understanding of what—you know, what banks do. They get to—they get a lot of discretion of how they want to get their money back and how they want to free it up, unless the law says otherwise. So that's kind of where I'd come out on that.

Id. at 95–96. As this discussion shows, the amount of Primebank's claim—and the arguments it is trying to make again about guarantor payments and internal accounting—were at issue in the adversary and discussed at trial.

The parties also presented arguments on Primebank's claim amount in their briefs. Under the heading "How much is owed to Primebank?," Oyens stated:

> To determine the answer to this question, the Court has to determine the effect of the guarantor transactions in December 2009. First, the Court has to determine which portion of each of the December 2009 promissory notes was the prior personal liability of the guarantors. Then, the Court can determine from the history of payment whether each payment was to be applied to the guarantor liability for Crooked Creek or to the personal liability of the Langels.

Oyens' Post-Trial Brief, Adv. 09-9093, Doc. 146 at 1 (May 8, 2014). Oyens then summarized what it believed the evidence showed, presented its analysis about how payments should be applied, and concluded that Primebank was owed $114,710.81. Id. at 1–7.

Similarly, Primebank's brief began with a summary of the evidence presented at trial. One of the subheadings is "Principal Amount Owing on the Debtor's Obligations." Primebank's Post-Trial Brief, Adv. 09-9093, Doc. 147 at 2 (May 8, 2014). Primebank summarized the evidence presented on this issue, noting that the exhibits and testimony it presented at trial showed $515,270.19 in principal owing to Primebank. Id. 2–5.

Moreover, in the analysis section of its brief, Primebank's second heading is "The Amount to Which the Bank is Entitled." Id. at 11. Under that heading, Primebank presents its argument about why Oyens is wrong about the amount Primebank is owed and concludes that it "is owed principal of $15,270.19 on *the*

15

Case 09-02352    Doc 134    Filed 03/09/17    Entered 03/09/17 16:14:08    Desc Main
              Document      Page 16 of 19

*Debtor's loan* and none of the amounts applied, or forgiven, or held towards the *Langels' personal debts*—neither the $150,559.38 nor the $200,000 nor the $50,000 claimed by Oyens—can or should be applied to *the Debtor's loan*." Id. at 14 (emphasis in original).

As these statements show, one of the issues presented to the Court in the adversary was the amount of Primebank's claim and the effect of the guarantor transactions. In its ruling, the Court addressed this evidence and argument and ruled on the issue, concluding that "Primebank's claim is limited to $315,270.19." Oyens Feed & Supply, Inc. v. Primebank (In re Crooked Creek), Bankr. No. 09-02352S, Adv. No. 09-9093, at 4–6, 12 (Bankr. N.D. Iowa October 21, 2014).

Primebank's argument that the amount of its claim was not at issue in the adversary proceeding is meritless. Primebank is correct that lien priority—in particular, acquisition price—was the primary legal issue that the Court addressed. But in addressing that issue, Oyens raised the amount of Primebank's claim, and the Court decided it in resolving the adversary. As the discovery disputes, the parties' arguments, briefs, and the Court's own comments and rulings show, Primebank's claim amount was squarely before the Court in the adversary.

## II.   Essential to Judgment

Primebank argues that, even if it was raised, the Court did not necessarily need to determine the amount of its unsecured claim in the adversary. Oyens

16

argues that the Court's finding that Primebank's secured claim is less that the amount of its security was necessary to the disposition of the adversary.

The Court agrees with Oyens. The amount of Primebank's claim was necessary to the Court's judgment. At issue in the adversary was the parties' respective liens on $358,841.10 in hog proceeds. Primebank argued that it had a lien on the entire amount of the proceeds. The Court disagreed and found that Primebank's claim was "limited to $315,270.19." The Court did not determine the amount of the claim based on the value of the security, but based on the total amount of Primebank's claim. See id. at 4–6.

Thus, the Court's conclusion that Primebank's **unsecured claim** was limited to $315,270.19 was necessary to its determination that Primebank's **secured claim** was limited to $315,270.19. Put another way, the Court found that Primebank did not have a lien in the entire amount of the proceeds, but only on $315,270.19, because it found that Primebank only had a claim for $315,270.19.

It is undisputed that the adversary was about how much of the proceeds should go to Primebank and how much should go to Oyens. The Court concluded that "Oyens has a superpriority claim for $156,367.43 and an unsecured claim for $186,004.35. . . . Primebank's claim is limited to $315,270.19." Id. at 12. Determining the amount of Primebank's claim—to determine Primebank's interest

in the proceeds at issue—was essential to that judgment because of the way Oyens placed it in issue and argued the case.

Oyens has shown that issue preclusion bars Primebank from claiming that it is owed more than $315,270.19. The Court heard argument and evidence on the amount of Primebank's claim. The Court took briefing on the amount of Primebank's claim. In ruling on the relative entitlement to the proceeds, it determined the amount of Primebank's claim to be $315,270.19. Primebank's arguments—that the amount of its claim was not before the Court in the adversary and that the Court did not necessarily decide the amount of its claim—have no basis. Oyens has shown that Primebank's proof of claim is nothing more than an attempt to relitigate an adverse ruling. Primebank is precluded from arguing that its claim is different than what the Court found in its ruling. Primebank's arguments are simply a repeat of its attempts to skirt around this issue by insisting that guarantor payment were outside the scope of the litigation in one way or another. The three rulings—on the motion to compel, the motion for sanctions, and the ruling on the trial—show that, throughout the litigation in the adversary, Oyens repeatedly raised the issue of guarantor payments and Primebank's claim. The Court ruled on this issue. Primebank did not appeal the issue. Primebank is bound by this Court's ruling on its claim and is precluded from arguing otherwise.

Because Primebank is precluded from arguing that its claim is other than what this Court decided it was in the adversary, the Court does not reach Primebank's arguments about the amount of its claim, whatever their merit.  See Sandy Lake Band of Miss. Chippewa v. United States, 714 F.3d 1098, 1104 (8th Cir. 2013) (quoting Ginters v. Frazier, 614 F.3d 822, 830 (8th Cir. 2010) (Colloton, J., dissenting)) ("Issue preclusion prevents relitigation of wrong decisions just as much as right ones." (internal quotation marks omitted)); Cont'l W. Ins. Co. v. Fed. Hous. Fin. Agency, 83 F. Supp. 3d 828, 839 (S.D. Iowa 2015) ("The mere assertion of a different ground to reach the same outcome does not bar application of issue preclusion because it is reasonable to require a party to bring forward all evidence in support of its argument in the initial proceeding." (internal quotation marks omitted)).  The Court has already adjudicated the amount of Primebank's claim.  Primebank cannot relitigate the amount of its claim.

## CONCLUSION

**WHEREFORE**, Oyen's Feed & Supply, Inc.'s Objection to Primebank's Third Amended Proof of Claim is SUSTAINED.

Dated and Entered:
March 9, 2017

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE